## NEWMAN *v.* THE STATE.

HILL, J. Under the facts of this case the court erred in refusing a change of venue.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent, and* BECK, J., dissenting. · In cases like the present, the court is vested with a discretion as to whether he will grant the order applied for, and under the facts presented in the record there was no abuse of discretion in refusing the order.

MARCH 9, 1915.

Indictment for murder; change of venue. Before Judge Wright. Floyd superior court. January 27, 1915.

This case is here on exceptions to the judgment of the court below, denying a motion for a change of venue under the act of 1911

(Acts 1911, p. 74).   At the hearing of the motion the movant, by affidavit, testified substantially as follows:   He had been indicted by the grand jury of Floyd county for the offense of murder, the indictment alleging that he did, on the 2d day of January, 1915, kill and murder one Benjamin Franklin in that county.   At the time of making the affidavit the January term, 1915, of the superior court was in session, and a jury was empaneled, and affiant was about to be tried before the jury at that term.   On January 5, 1915, he was carried to jail in Fulton county for the purpose of safe-keeping, having been removed by the sheriff of Floyd county to the latter jail.   In movant's judgment an impartial jury can not be obtained to try him in Floyd county.   The public mind there is highly inflamed on account of the alleged crime.   The deceased was a white man and affiant is a negro, and on account of the difference in the races the public sentiment is abnormal towards affiant.   He charges and believes, and has been informed, that two members of the Rome bar have been employed by parties unknown to him, for the purpose of assisting the solicitor-general in his prosecution.   Since the homicide it has been heralded over the county by a newspaper having a large circulation in the county.   It was published therein that it was necessary to remove affiant to the Fulton county jail for protection, and this helped to scatter broadcast the nature of the feeling of the public in the community against affiant, and helped to engender the general ill feeling that now prevails against him.   There is probability of lynching, or other violence being done affiant, if he is tried in Floyd county. On the day he was removed from jail in Floyd county, the sheriff of that county heard statements freely made by various parties, asserting their intention of lynching affiant that night.   Crowds were beginning to collect; and affiant charges and believes, and has been informed, that the crowds were collecting for the purpose of forming a mob to lynch affiant.   The sheriff did not attempt to take him to Atlanta by boarding a train in Rome; but he procured an automobile, and, in company with affiant, one George West Bowen, who is charged with the same offense, and deputy sheriffs Watts and Bobo, went to the Rome Brick Company station on the Western & Atlantic Railroad and there boarded a train, this station being about three miles northeast of Rome.   It is necessary to change trains at Kingston for Atlanta, and when sheriff J. R. Barron arrived in Kingston, the marshal of Kingston stated to the

sheriff that he had received a telephone message from one of the deputy sheriffs of Floyd county (G. W. Smith), suggesting that the sheriff, unless a train was ready, go immediately to Cartersville in an automobile. Affiant was informed and believes that five automobiles, filled with armed men, followed the sheriff who had affiant in charge, and that their purpose was to lynch affiant.

The sheriff of Floyd county testified that on January 5, 1915, he was summoned by Judge Wright, judge of the superior courts of the Rome circuit; and when he responded, the judge suggested that he thought it would be best to have the defendant carried to Atlanta for safe-keeping. On that date he did carry the defendant to Atlanta. He was in a restaurant in Rome, and while there overheard four or five people, whom he did not know, making threats that they would get him (meaning the defendant Newman) that night. The crime which the defendant was charged with having committed was being generally discussed, and for that reason he knew the threats were being directed against the defendant. It was arranged that the defendant was to be carried to Atlanta, first by the police department of Rome taking him in the police patrol beyond the city limits, and there delivering him to the sheriff and his deputies. The defendant was to lie down in the patrol-wagon, so that he could not be seen. When he arrived at Kingston, the marshal notified the sheriff that he had been telephoned by the deputy sheriff in Rome that if the train for Atlanta was not ready when the sheriff arrived, the latter should go by automobile to Cartersville and catch a train at that place for Atlanta, as five automobiles loaded with armed men were following the sheriff. The sheriff turned the defendant over to the jailer in Fulton county, Ga., where he has since remained.

G. W. Smith, one of the deputy sheriffs of Floyd county, testified, that, a short time after the motion for a change of venue in this case had been presented to the court, he was accosted by a resident of Rome, who, among other things, stated that had the defendant, Newman, remained in Rome, he would have been lynched. He stated that he, together with about thirty others, went as far as Kingston, following the defendant; that some people were waiting there to help in the matter, and that he did not believe the sheriff would have refused to surrender the defendant to the mob if it had reached Kingston in time.

T. J. Barron testified that on the date the sheriff took the defendant to Atlanta, he went to the old Mitchell homestead, beyond the city ·limits, and while on his way back he met two automobiles going towards Kingston at a very rapid rate of speed, and both of the cars were loaded with men.

M. C. Broach testified that on the above-named date he saw an automobile being filled with men. One of the men had a gun, and one of them had a gun-case, but whether or not a gun was in the case he did not know. This was on Broad street in Rome, between three and four o'clock p. m., and a short time after defendant had been carried on the way to Atlanta. It was generally understood that the automobile was preparing to, and ·afterwards did, follow the car in which the defendant was being taken to Kingston.

Copies of the Tribune-Herald, a newspaper published in Rome on January 7, 1915, or so much thereof as contained an account of the inquest held over the body of the deceased, and portions of the evidence displayed in large headlines on the front page of the paper, were in evidence.

C. I. Harris, chief of police of Rome, sworn for the State, testified that he did not think the defendant, Newman, was in any danger whatever of being mobbed on the day he was carried to Atlanta; and did not personally hear any threats made against him. He heard it was talked. He was of the opinion that there was no danger in bringing Newman back to Floyd county to be tried, and that "he would secure a fair, impartial, and quick trial in Floyd county." He said it was not customary for persons preparing to participate in mob violence to talk about it in the presence of peace officers, though such officers are very likely to hear of such talk. In the afternoon of the day the defendant was taken to Atlanta, upon his return from the point where the affiant carried Newman to meet sheriff Barron, he met an automobile, probably two, up on Broad street, and when he reached the city proper he heard that they had followed the sheriff and the defendant. On that afternoon he heard some discussion that five automobiles, loaded with men armed with guns, were in pursuit of the sheriff and the defendant. He made the defendant, Newman, lie down in the police patrol-wagon when taking him beyond the city limits to the point where he delivered him to the sheriff. He did this because he had orders from the sheriff to carry him that way, so no one would see him.

18

His motive in doing that was that no one should see him. The reason he did not think the defendant in danger of being lynched was that he "did not think those persons brave enough to participate in a mob."

John Bobo, deputy sheriff of Floyd county since January 1, 1915, testified that it was his judgment that if the defendant had remained in Floyd county he would not have been molested, and that he can get a fair and impartial trial. Henry Watts, J. L. Foster, and M. Haisfield testified to the same effect as did Bobo.

*Harris & Harris,* for plaintiff in error. *W. H. Ennis, solicitor-general, McHenry & Porter,* and *Max Meyerhardt,* contra.